PAUL J. BEARD II (State Bar No. 210563)
FISHERBROYLES LLP
453 S. Spring Street, Ste. 400-1458
Los Angeles, CA 90013
Telephone: (818) 216-3988
E-mail: paul.beard@fisherbroyles.com

Attorneys for Plaintiffs LITTLE WOODS MOBILE VILLA LLC
and YOUNGSTOWN MHP LLC

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LITTLE WOODS MOBILE VILLA LLC, a California limited liability company, and YOUNGSTOWN MHP LLC, a California limited liability company,<br><br>    Plaintiffs,<br><br>        v.<br><br>CITY OF PETALUMA; and DOES 1 through 20, inclusive,<br><br>    Defendants. | Case No.: _____<br><br>**COMPLAINT FOR VIOLATION OF FEDERAL CIVIL RIGHTS**<br><br>**(42 U.S.C. § 1983)** |

**JURISDICTION AND VENUE**

1.    Jurisdiction is proper under 28 U.S.C. § 1331 because this action arises under the laws of the United States, and this Court has the power to grant the declaratory judgment requested herein under Fed. R. Civ. P. 57 and 28 U.S.C. § 2201, as well as injunctive relief pursuant to Fed. R. Civ. P. 65.

2.    Under 28 U.S.C § 1391(b), venue is proper in the Northern District, where Defendants are located and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred.

**DIVISIONAL ASSIGNMENT**

3.    Under L.R. 3-2(d), assignment is appropriate to the San Francisco or Oakland Division, because all actions, events or omissions giving rise to Plaintiffs' claims occurred in Sonoma County.

**PARTIES**

4.    Plaintiff LITTLE WOODS MOBILE VILLA LLC ("Little Woods") is a limited liability company that owns a mobilehome park, Little Woods Mobile Villa, at 1821 Lakeville Hwy., in the City of Petaluma, California.

5.    Plaintiff YOUNGSTOWN MHP LLC  ("Youngstown") is a limited liability company that owns a mobilehome park, Youngstown Mobile Home Park, at 911 N. McDowell Blvd., in the City of Petaluma, California.

6.    Defendant CITY OF PETALUMA is a charter city and has regulatory jurisdiction over Little Woods and Youngstown. The City can sue and be sued.

7.    Plaintiffs are unaware of the true names and capacities, whether individual, associate, corporate or otherwise, of Defendants DOES 1 through 20, inclusive, or any of them and therefore sues said Defendants, and each of them, by such fictitious names. Plaintiffs are informed and believe and based thereon allege that each of the fictitiously names Defendants are responsible in some manner for the occurrences or omissions. Plaintiffs will seek leave of this Court to amend this Complaint when the names and capacities of said Defendants are ascertained.

**GENERAL ALLEGATIONS**

**I.    Legal Background**

**A.    Leasing Space at a Mobilehome Park**

8.    As used in this Complaint, the term "mobilehome" includes true mobilehomes (as defined

in California Health and Safety Code ("H&SC") section 18008), manufactured homes (as defined in H&SC section 18007), and trailers. Cal. Civ. Code § 798. All three can be found at mobilehome parks in California, including at Little Woods and Youngstown.

9.     A mobilehome owner seeking to reside at a park rents or leases, from that park, a plot of land (also known as a "space," a "pad," a "lot," or a "homesite") on which the mobilehome is placed. In consideration of the payment of monthly rent, the park provides the mobilehome owner with the plot of land that he or she leases, private roads within the park, utilities, and common amenities, such as a clubhouse, swimming pool, and other shared features.

10.     The mobilehome is typically installed on the lot by placing it on top of movable concrete blocks, removing the wheels and axles (which are then typically stored beneath the home), connecting the home to the park's utility hook-ups, and installing accessories such as stairs or awnings. The home is not installed on a permanent foundation. Often, when a homeowner decides to move out of a park, they sell their home "in place" to a new homeowner, who must be approved by the park and enters into a new lease agreement with the park. But while mobilehomes are often sold "in place," a mobilehome owner always has the physical ability—and the legal right, at their option—to remove the home from the park by removing any accessories such as stairs and awnings, disconnecting from the park's utility hook-ups, reinstalling the wheels and axles, removing the movable concrete blocks stacked beneath the home, and paying a mobilehome transporter to move the home to a different location. Multiple mobilehome transporters serve the Petaluma market and provide these services. A cursory search on Craigslist.com or Facebook Marketplace will reveal that there is an active market for used mobilehomes that homeowners have removed from mobilehome parks. After removing their home from a park, the homeowner may transfer their home to a vacant lot in another local mobilehome park (if a vacant lot is available), or they may transfer their home to a mobilehome park in another county or state, or they may transfer their home to privately owned residential land that they purchase, or they may sell their used home on the open market to someone who wishes to place it in a mobilehome park or on privately owned residential land.

11.     The mobilehome is legally classified as movable personal property, which belongs to the homeowner.  Like an automobile, the mobilehome has its own title, which is issued by a state agency (the California Department of Housing and Community Development or "HCD"). Like an automobile, the

mobilehome must be registered annually with the HCD.

12.     The homeowner receives certain economic benefits due to the fact that their home is legally classified as movable personal property, and not real property. For example, mobilehomes that were first sold before June 30, 1980 are exempt from local property tax and instead pay an annual "in lieu" license fee to the HCD. The fee is typically around $100 per year, which is much less than what property tax would be. Many of the mobilehomes at Youngstown and Little Woods were first sold before June 30, 1980 and are therefore exempt from property tax. Mobilehomes first sold on or after July 1, 1980 are subject to property tax, but benefit from the fact that the county assessor typically under-assesses a mobilehome's value, relative to other property types, because a mobilehome is movable personal property that depreciates over time. For example, a mobilehome at Youngstown was assessed at $99,366 in the 2010-2011 tax year, which translated to $933.66 in property tax payable by the homeowner. The same home was assessed at $63,007 in the 2021-2022 tax year, which translated to $630.07 in property tax payable by the homeowner.

13.     The leasehold relationship between the park owner and the mobilehome owner is governed by the California Mobilehome Residency Law (the "MRL"), found in Section 798, *et seq.*, of the California Civil Code. Section 798.18, titled "LENGTH OF AGREEMENT," specifies that "[a] homeowner shall be offered a rental agreement for (1) a term of 12 months, or (2) a lesser period as the homeowner may request, or (3) a longer period as mutually agreed upon by both the homeowner and management." Under the MRL, mobilehome parks are required to offer leases in writing. Cal. Civ. Code § 798.15. The written leases must include the term of the tenancy (*id.* § 798.15 (a)), a notice that "the MRL is deemed a part of the terms of any park rental agreement or lease" (*id.* § 798.15(i)), and a notice that park management may "terminate or refuse to renew a homeowner's tenancy" in accordance with seven narrowly defined reasons set forth in the MRL (*id.* § 798.15 (i)(3)). One of the statutory reasons for terminating or non-renewing a tenancy is a "[c]hange of use of the park or any portion thereof"—including park closure—provided that park management complies with certain stated requirements, such as giving the affected tenants adequate notice. (*Id.* § 798.56 (g)). Little Woods and Youngstown have fully complied with the statutory requirement to provide written leases and rental agreements containing these notices.

14.     Inherent in every lease or rental agreement between park and homeowner is the parties'

understanding that the homeowner acquires only a ***leasehold*** from the park—i.e., a temporary right to occupy and use the park's plot of land for a fixed term. *See, e.g.*, *Brown v. Legal Found.*, 538 U.S. 216, 233 (2003) (describing "leasehold" use as "temporary"); *People v. Bell*, 197 Cal. App. 4th 822, 828 (2011) ("The leasehold is temporary in that it is for a fixed term and not permanent . . . ."). No park lease or rental agreement, including any that Little Woods and Youngstown have executed with homeowners, waives the right of a park, as the fee simple owner, to cease operations and close the park. And, in executing a lease or rental agreement, no homeowner could reasonably expect to have acquired a fee simple or other permanent interest in the leased space entitling the owner to permanent occupation and use thereof. Ever present in the leasehold context is the possibility that the park may have to close down.

15.     Mobilehome owners choose to accept the risk of park closure as part and parcel of their economic bargain with the park for a simple reason: ***Renting*** a plot of land in a mobilehome park is substantially less expensive than ***purchasing*** a plot of land to install the mobilehome. So, the risk of closure is an integral and known part of the economic bargain between park and homeowner. A mobilehome owner who chose to purchase their plot of land in fee simple would run no risk of displacement. But instead, mobilehome owners make the deliberate economic decision to ***lease*** the land for a fraction of the cost of land ownership and thereby accept the known risk—as leaseholders—that the landowner can close the park and require their relocation. This central fact is clearly recognized by the MRL, which specifies ***how*** a park owner may close down their park (in order to ensure that homeowners in the park receive reasonable notice), but never questions ***whether*** a park owner has the legal right to close the park. The park owner is the fee simple owner of the land; accordingly, the park owner may choose to operate a mobilehome park lot rental business on the land that they own, or they may choose to cease operating such a business on the land that they own. The MRL plainly recognizes that the government cannot compel the park, as the landowner, to perpetually operate a mobilehome park lot rental business on the land that the park owner owns.

16.     For example, Youngstown's lease and rental agreements make this abundantly clear by explicitly requiring mobilehome owners in the park to acknowledge that they are (1) "acquiring a leasehold for a limited period of time," (2) purchasing "only the HOME which occupies the HOMESITE," and (3) not acquiring the added value attributable to the plot of land where the mobilehome is located.

Youngstown's agreements include the following language (Lease Section 6.3), as a stand-alone paragraph, which the homeowner is required to acknowledge by initialing directly below the paragraph:

> "HOMEOWNER understands, agrees, and acknowledges that HOMEOWNER is acquiring a leasehold for a limited period of time and is purchasing (or has purchased) only the HOME which occupies the HOMESITE.  Ownership of the HOMESITE remains with [park] OWNER. The price, appraisal, or stated value of the HOME may reflect not only the HOME'S value, but its "site" value; that being the willingness of a lender to finance or a purchaser to pay a larger amount for the HOME by virtue of its location in the PARK.  In other words, the HOME may be worth substantially less if not located on the HOMESITE than on the HOMESITE. HOMEOWNER understands that HOMEOWNER is not entitled to receive any value for [park] OWNER'S property."

17.    Furthermore, under the MRL, parks are required to provide an annual notice to all mobilehome owners in the park regarding any recent changes to the MRL, and to annually offer to all mobilehome owners in the park a complimentary paper copy of the MRL so that they can review the respective rights and responsibilities of homeowners and the park. Both Little Woods and Youngstown have dutifully complied with this requirement every year. The MRL booklet offered annually to all homeowners includes a section (Cal. Civ. Code § 798.56(g)) specifying that they must vacate the park in the event of park closure. Thus, mobilehome owners are very much on notice, and are reminded annually, that the park has the right to cease operations.

## B.    Petaluma's "Rent Stabilization" Ordinance

18.    Some local governments in California have enacted so-called mobilehome "rent stabilization" ordinances. Often, these are different from the ordinary rent control that applies to apartment and other kinds of rentals in that mobilehome parks are prohibited from resetting their controlled, artificially suppressed lot rents back up to market rates when a mobilehome owner in the park sells their mobilehome "in place" to a new homeowner, who then moves onto the park's land under a new lease. This unique feature of many mobilehome "rent stabilization" laws is known as "vacancy control," as rent

increases are controlled even ***after*** a new homeowner moves onto the park's land.

19.     A rent-control ordinance must guarantee the rental owner's constitutional right to a fair return on their investment, under the Fifth Amendment to the United States Constitution. A fair return consists of a rental amount that covers both the reasonable costs of maintaining and operating the rental property and a reasonable return on capital. Merely bringing in enough rent to stay in business is not a fair return. Courts have recognized that property owners expend time, effort, and capital—and take on substantial risk—in order to provide rental housing, which is crucial for society and which society wants more of. Courts have therefore held that rent control ordinances are unconstitutional if they deprive rental property owners of a rate of return that is adequate to incentivize investors to allocate capital to rental real estate, as opposed to other investment alternatives such as stocks and bonds.

20.     Petaluma has enacted a "Mobilehome Park Space Rent Stabilization Program" (hereinafter, the "Rent Control Law"). Petaluma Municipal Code ("PMC") § 6.50.010, *et seq.* The Rent Control Law deprives park owners of their constitutional right to a fair return on their investment. It does this in three ways.

   a.   The Rent Control Law limits mobilehome parks' automatic annual rent increases to 70% of the percent change in the Consumer Price Index, capped at 4%. PMC § 6.50.040(A). In other words, the Rent Control Law decrees that ***mobilehome park businesses will not even be allowed to keep up with the cost of inflation***. Prima facie, this is not a fair return. Given the last several years of unusually heated inflation, and the fact that mobilehome parks' insurance costs have tripled due to recent catastrophic wildfires in Sonoma County, the Rent Control Law has prevented (and continues to prevent) parks like Little Woods and Youngstown even from keeping up with the rising costs of inflation, let alone ensuring an adequate return on their invested capital. This plainly violates one of the Rent Control Law's stated purposes, which is to "provide mobilehome park owners with  a guaranteed rate of annual space rent increase which accurately reflects the rate of inflation." PMC § 6.50.010.O.3.

   b.   Petaluma imposes vacancy control on all of its mobilehome parks, including Little Woods and Youngstown. PMC § 6.50.240.C. As a result, there is no "re-set" to fair

market rents, even when a mobilehome owner who has benefitted from artificially low rent-controlled rents for years (or decades) moves out of the park, and a new owner moves in.   The new mobilehome owner inherits the prior owner's artificially suppressed lot rents, even though the new owner enters into a new lease agreement with the park, and even if the new mobilehome owner is willing and financially able to pay a fair market lot rent to the park.   As a result, due to the Rent Control Law, the park owner's expenses rise faster than the park owner's rental revenues throughout the duration of a homeowner's tenancy on a homesite—and then the park owner's expenses continue to rise faster than inflation during the next tenancy on that homesite, and the next tenancy after that, in perpetuity, without ever resetting the base rent to a fair market rate. Eventually, this scenario where the park's costs perpetually rise faster than its income can only lead to one outcome for the mobilehome lot rent business: bankruptcy. This inevitability has forced Little Woods and Youngstown to begin the park closure process, rather than continue to operate a business that is doomed to become insolvent.

c.   Under the Rent Control Law, a park owner nominally has the right to apply to the City to obtain a rent increase greater than the "70% of CPI, capped at 4%" increase which is automatically authorized. PMC § 6.50.040(C). Superficially, this provision gives the Rent Control Law the appearance of complying with the constitutional right to a fair return, by specifying a process through which a park owner can apply for a rent increase. In reality, this provision creates a series of insurmountable hurdles that a park owner must clear before obtaining a fair return. The cards are stacked against the park owner, suggesting that the City's true intent is to minimize the likelihood that park owners will apply for a rent increase, and then to minimize the chance of success for those park owners who do apply. To wit: The park owner must go through an "arbitration hearing," which is an adversarial process pitting the park owner against their tenants. *Id.* § 6.50.060(F).   The city gets to pick the arbitrator. *Id.* § 6.50.060(E). The burden of proving that the rent increase is reasonable falls on the park owner.   *Id.* § 6.50.060.F.1. The Rent Control Law demands that it "shall be liberally construed to

achieve its purpose" (*id.* § 6.50.2030), which includes to "prevent the imposition of exploitive, excessive and unreasonable mobilehome space rent increases" and to "assist in alleviating the unequal bargaining power which exists between mobilehome park residents and mobilehome park owners." *Id.* § 6.50.010.O. The outcome is decided by the City-appointed arbitrator who decides, in their discretion, whether to allow an increase. In "evaluating the space increase proposed or imposed by the owner," the arbitrator can consider "***any*** . . . factors deemed relevant" to the arbitrator, including the park residents' current financial circumstances. *Id.* § 6.50.010 (emphasis added). Residents may be represented by different attorneys; for example, in Youngstown's 2022 arbitration, tenants were represented by three different attorneys. Thus, while the park owner's counsel has one opportunity to examine each witness before the arbitrator, the residents may have three (or more) opportunities to examine each witness. Inevitably, the arbitration becomes performative, with the residents' counsel putting specific residents on the witness stand because of those residents' specific financial, health, or family circumstances—regardless of whether those individuals' circumstances are representative of the other park residents. Highlighting those individuals' stories in a public arbitration hearing, particularly in a small city like Petaluma, reduces the likelihood of the arbitrator granting a rent increase, even if those individuals' stories have no actual relation to the question of a fair return.

**C.    The Actual Value Versus the Artificially-Enhanced "In-Place" Value of a Mobilehome**

21.    As an item of movable personal property, a mobilehome has a fair market value. Just as used cars have a "blue book" value, used mobilehomes have a National Automobile Dealers Association Guide ("NADA Guide") value. The NADA Guide is the industry's standard information source for estimating the market value of a used mobilehome as movable personal property, with no assumptions about where the home is or might be installed. In other words, the NADA provides the "inherent value" of a mobilehome.

22.    Buyers of used mobilehomes at Youngstown are willing to pay astronomically high prices

for those homes, relative to those homes' inherent value, because they are installed at Youngstown. On average, used homes sold in-place at Youngstown sell for **ten times** their inherent value. A variety of factors explain this: Petaluma is an extremely expensive housing market, with a median single family home value over $900,000; local housing demand far exceeds housing supply; there is a near-zero vacancy rate in the local rental market; Youngstown is a "Class A" park with amenities including a pool and clubhouse; and Youngstown's space rents are artificially cheap—roughly 50% of fair market value—due to the city's Rent Control Law.

23.     At Youngstown, used mobilehomes that are 40 to 50 years old, with an inherent value of roughly $13,000, are selling for roughly $130,000. In other words, obsolete mobilehomes that have very little inherent value are trading for **ten times** their inherent value at Youngstown, because of locational factors and the park owner's investment-backed success in creating and managing a high-quality park— factors that inflate the in-place value of the selling residents' homes. The table below shows the eight most recent sales of resident-owned mobilehomes at Youngstown. The same pattern applies at Little Woods.

| Lot # | Year of Manufacture | Manufacturer | Dimensions | Condition | Date Sold | Inherent Value (NADA Guide) | In-Place Sale Price | In-Place Value Discrepancy |
|---|---|---|---|---|---|---|---|---|
| 82 PC | 1977 | Skyline | 60x24 | Fair | April 2022 | $11,947.15 | $161,650 | 1353% |
| 9 PD | 1975 | Lancer | 60x24 | Good | February 2021 | $15,459.22 | $167,500 | 1083% |
| 34 PD | 1975 | Kaufman | 44x20 | Good | May 2021 | $10,300.68 | $79,000 | 767% |
| 74 PD | 1977 | Skyline | 60x24 | Fair | March 2023 | $11,947.15 | $145,000 | 1214% |
| 103 PC | 1977 | Skyline | 60x24 | Good | February 2023 | $16,318.06 | $155,000 | 950% |
| 55 MD | 1977 | Skyline | 60x24 | Poor | October 2022 | $10,198.79 | $90,000 | 882% |
| 77 PD | 1977 | Festival | 60x24 | Good | January 2022 | $16,318.06 | $115,000 | 705% |
| 116 PD | 1977 | Skyline | 60x24 | Fair | June 2021 | $11,947.15 | $157,000 | 1314% |
|  |  |  |  |  | **Average:** | **$13,054.53** | **$133,769** | **1034%** |

24.     The sellers and buyers of these mobilehomes acknowledged and agreed in their rental

agreement with Youngstown as follows: "The price, appraisal, or stated value of the HOME may reflect not only the HOME'S value, but its 'site' value; that being the willingness of a…purchaser to pay a larger amount for the HOME by virtue of its location in the PARK.  In other words, the HOME may be worth substantially less if not located on the HOMESITE than on the HOMESITE. ***HOMEOWNER understands that HOMEOWNER is not entitled to receive any value for [park] OWNER'S property***" (emphasis added).

25.     For a Petaluma park owner, the economics of paying the "in-place" value to purchase a used mobilehome from a park resident are cost prohibitive. Consider the average used mobilehome at Youngstown, which has a NADA Guide value of $13,000 and an in-place value of $130,000. The fair market lot rent for the lot that the home sits on may be $1,800 per month, but due to the City's Rent Control Law, the lot rent is artificially suppressed to $750 per month. Thus, the lot generates $9,000 of rental revenue per year ($750 x 12 = $9,000). After the park pays property tax, insurance, utilities, property management, labor, repairs and maintenance, mortgage debt service, and reserves, the park may net a 7% profit margin. This means that the lot that the home sits on may generate $630 in profit per year ($9,000 x 7% = $630).  To pay $130,000 to purchase the used home, the park would need to spend ***206 years*** of profits ($130,000 ÷ $630 = 206.3). In other words, it would take the park approximately 206 years of leasing out the lot in order to generate enough profit to pay the homeowner the in-place value of their home. The reason this number is so extreme is because of the distortive effects of rent control. Because of rent control, the park's lot rents are artificially low, and consequently the home's in-place value is artificially high.  Due to the combination of those two factors, the park is financially incapable of paying the in-place value for residents' homes anytime in the next two centuries.

**D.     The Law on Mobilehome Park Closures Prior to January 1, 2021**

26.     Prior to January 1, 2021, both City and state law required a park to comply with certain notice and other requirements before terminating a tenancy due to a change of use of the park, including outright closure. State law preempted any conflicting City requirements.

27.     Required notice included giving homeowners at least 15 days' written notice that the park would be appearing at a hearing before a local government board, commission, or body to request permits for the change of use or closure. *See* Cal. Civ. Code § 798.56(g)-(h) (pre-January 1, 2021).

28.     Prior to January 1, 2021, California's Planning and Zoning Law ("PZL") required a park proposing a change in use or closure to prepare and file a report on the impacts upon the displaced residents of the mobilehome park. The report had to include, among other things, the availability of "adequate" replacement housing in mobilehome parks and cost of relocation for displaced residents. *See* Cal. Gov. Code § 65863.7 (pre-January 1, 2021).

29.     Prior to January 1, 2021, the PZL also required the park to provide the impact report to a resident of each mobilehome in the park at least 15 days before the hearing on the impact report by the advisory agency or legislative body. The PZL required said advisory agency or legislative body to review the report and authorized it, as the condition of any change of use or closure, to require the park to take steps to mitigate any adverse impact on the ability of displaced residents to find "adequate" housing in a mobilehome park. *Id.*

30.     In requiring mitigation, the PZL merely assumed, but did not establish, that a park's closure or conversion to another use is the ***cause*** of the inability of displaced residents to find "adequate" housing (however defined), thereby making the park legally responsible for mitigation of the residents' inability to relocate. But as explained above, the possibility of having to move out of a park—due to conversion, closure, or otherwise—is inherent in the leasehold for which a mobilehome owner willingly and knowingly contracts when moving into the park.

31.     Prior to January 1, 2021, the PZL demanded strict proportionality between the mitigation required of a park and a displaced resident's reasonable relocation costs. Specifically, the PZL mandated that "[t]he steps required to be taken to mitigate shall not exceed the reasonable costs of relocation." Cal. Gov. Code § 65863.7(e)(2).

**E.     The Law on Mobilehome Park Closures Starting on January 1, 2021**

32.     In 2020, the Legislature passed and the Governor signed into law Assembly Bill 2782 ("AB 2782"). The law became effective on January 1, 2021.

33.     The legislative intent behind AB 2782 purportedly is to address "the economic hardship brought on by COVID-19, [which] will likely cause many households difficulty in remaining current on their rental or mortgage housing payments." The bill alleges that "[w]ithout emergency action to prevent the displacement of mobilehome residents who have fallen behind on space rental payments, there will

likely be a significant increase in homelessness, exacerbating the ongoing homelessness crisis in the state." The bill goes on to claim that "[t]hose experiencing homelessness will not be able to comply with public health orders related to social distancing and self-quarantining, nor will they have access to facilities for maintaining good hygiene." AB 2782, § 1 (legislative findings). Little Woods and Youngstown categorically dispute those findings.

34.     AB 2872 modified the pre-requisites for a mobilehome park to close in a way that made it cost-prohibitive to do so. Among other things, the law eliminated the proportionality requirement of section 65863.7(e)(2) of the Government Code, so that cities and counties must condition a park closure on the park's payment of mitigation that **exceeds** the reasonable costs of relocation. Further, AB 2872 changed the law as follows:

     a.  AB 2782 changed the law to require the park to give homeowners at least 60 days' written notice that the park will be appearing before a local governmental board, commission, or body to obtain local approval for the intended closure of the mobilehome park.

     b.  AB 2782 changed the law to require the impact report to include a replacement and relocation plan that mitigates the impact on the ability of displaced residents to find "adequate" housing in a mobilehome park.

     c.  AB 2782 changed the law to require the park to pay for, and include in the impact report, an appraisal that determines the "in-place market value" of a mobilehome of a displaced resident who cannot obtain "adequate" housing in another mobilehome park.

     d.  AB 2782 changed the law to require the park to provide the impact report to a resident of each mobilehome in the park at least 60 days before the hearing.

     e.  AB 2782 added subsection (1) to section 65863.7(e) of the Government Code as follows: "(1) Before the approval of any change of use, the legislative body, or its delegated advisory agency, shall do all of the following: (A) Review the report and any additional relevant documentation. (B) Make a finding as to whether or not approval of the park closure and the park's conversion into its intended new use, taking into consideration both the impact report as a whole and the overall housing availability

within the local jurisdiction, will result in or materially contribute to a shortage of housing opportunities and choices for low- and moderate-income households within the local jurisdiction."

f.  AB 2782 added new subsection (2) to section 65863.7 of the Government Code as follows: "(A) If a displaced resident cannot obtain adequate housing in another mobilehome park, the person or entity proposing the change of use shall pay to the displaced resident the in-place market value of the displaced resident's mobilehome. (B) For the purposes of this paragraph, except as specified in subparagraph (B) of paragraph (1) of subdivision (e), in-place market value shall be determined by a state-certified appraiser with experience establishing the value of mobilehomes. The appraisal shall be based upon the current in-place location of the mobilehome and shall assume the continuation of the mobilehome park. (C) the person or entity proposing the change of use shall pay for an appraisal specified in subparagraph B) and shall include the appraisal in the report specified in paragraph (1)."

## F.     Petaluma Law on Mobilehome Park Closures

35.    The City must enforce, within its jurisdiction, the above state-law requirements for park closures, including the state-law requirement that a park "shall pay to the displaced resident" who "cannot obtain adequate housing in another mobilehome park" the "in-place market value of the displaced resident's mobilehome." *See, e.g.*, Cal. Gov. Code § 65863.7(h) (making provisions applicable to charter cities).

36.    The Municipal Code generally incorporates many of the same state-law requirements for mobilehome park closures, though some City requirements are more stringent than their state-law counterparts. *See* Municipal Code § 8.34.010, *et seq.*

37.    The new section 65863.7(a)(2)(A) does not define the circumstances under which "a displaced resident cannot obtain adequate housing in another mobilehome park" such that a park must pay the displaced resident the in-place value of their mobilehome. However, the Municipal Code effectively defines "adequate housing in another mobilehome park"—or "comparable mobilehome park"—as "any other mobilehome park within Sonoma County, substantially equal in terms of park amenities, rent and

proximity to services." Municipal Code § 8.34.020(D). That is why, when a park owner in Petaluma submits an application to close down a mobilehome park, the Municipal Code requires the impact report to include "[t]he location of all comparable mobilehome parks within Sonoma County," "[a] determination . . . of the total number of mobilehome units that are eligible to be relocated to a comparable mobilehome park," and "[a]n estimate of the fair market value of each mobilehome and all associated fixed property that cannot be relocated to a comparable mobilehome park." *Id.* § 8.34.050(C)(11).

**II.     Factual Background**

   **A.     Housing Availability in City of Petaluma and County of Sonoma**

38.     There are 208,462 total housing units in Sonoma County, according to 2022 U.S. Census data. Of these 208,462 housing units, 8,213 are mobilehome lots in mobilehome parks, according to 2023 California Department of Housing and Community Development data. Thus, mobilehome parks are a rare form of housing in Sonoma County, comprising 4% of Sonoma County's total housing supply. No new mobilehome parks have been built in Sonoma County in the past four decades, due to the local municipalities' restrictive land use policies.

39.     Compounding the fact that mobilehome parks in Sonoma County are in very short supply, there is significant demand to live in these parks, because local rent-control ordinances artificially keep the rents for mobilehome spaces below fair-market levels. As a result, parks are full, with long waiting lists. Both the City of Petaluma and the County of Sonoma have close to zero vacant mobilehome park spaces for Youngstown and Little Woods residents who would need to move their mobilehomes following park closure.

40.     While there are only 8,213 mobile home lots in Sonoma County, there are ***more than 200,000 non-mobilehome housing units*** in the county—including subsidized apartments, market-rate apartments, senior housing, and other housing types. In other words, there are 24 times more non-mobilehome park housing units in the county than mobilehome park housing units. When considering where to house individuals who can no longer remain in a mobilehome park due to a park closure, it is logical to consider the pool of housing stock that is 24 times larger than the pool of mobilehome lots. Said differently, there are many housing units in the county which can potentially house former residents of Youngstown and Little Woods, even if there are no vacant mobilehome lots available in the county.

41.    The closure of any mobilehome park in the City or County, let alone two parks such as Little Woods and Youngstown, would result in or materially contribute to a shortage of housing opportunities for low- and moderate-income households within the City and County. This is due to factors far beyond the park owners' control. This is a result of decades of restrictive local land-use policies and decades of state laws such as the California Environmental Quality Act (CEQA) that dramatically inhibit housing development, as well as decades of economic and demographic tides that are beyond the control of any single private property owner or local government. In a local housing market that has a near-zero vacancy rate and is chronically starved of new housing supply, it goes without saying that the closure of any rental property will contribute to the housing shortage. This is not the fault of Little Woods or Youngstown or any other rental housing owner; and it is not fair to punish them for it. All the more so in a scenario such as this one, where the City's own unconstitutional Rent Control Law has made it financially impossible for parks to continue to operate their mobilehome park businesses.

42.    In California, local governments are subject to state-imposed quotas for producing and maintaining housing at different affordability levels within their jurisdictions. These quotas are known as Regional Housing Needs Allocation (RHNA) quotas. If a local government does not meet its RHNA quota—for example, by losing affordable housing units without adequately replacing them with new housing units—then the local government can lose state funding and even face lawsuits from the State Attorney General. Thus, Petaluma, which has a very poor record of producing new affordable units for its citizens, is loath to lose any existing affordable units. Mobilehome parks like Little Woods and Youngstown are deemed affordable units that serve low- and very-low-income households, and these are the units which are economically most difficult to replace. Therefore, the City of Petaluma, which has the purported power to allow or disallow a park to close, has a strong vested interest in stopping the closure of any park within the City. Consistent with that strong vested interest, the City of Petaluma has actively and publicly sided with park residents to resist Little Woods' and Youngstown's closures and effectively compel these parks to stay open—as if they were government-owned entities, even though they are private businesses operating on privately owned land with no government subsidies.

43.    For example, in public comments at an August 7, 2023 City Council meeting, Petaluma City Attorney Eric Danly noted that Youngstown's and Little Woods' notices of potential park closure

had caused "a lot of concern among residents, understandably," promoted resident advocacy groups as the City's "non-profit partners," encouraged park residents to attend a so-called "know your rights" workshop focused on "organizing and building resident power," and encouraged residents to contact Legal Aid of Sonoma County and California Rural Legal Assistance, Inc.

44.     The City has tried to have its cake and eat it too. In the process, the City has run roughshod over the rights of Little Woods and Youngstown. On the one hand, the City imposed an unconstitutional Rent Control Law on its mobilehome parks, decreeing that park rents are not allowed to keep up with inflation, and thereby depriving Little Woods and Youngstown of a fair return on investment as guaranteed to them by the Fifth Amendment.  On the other hand, when they began the park closure process after the Rent Control Law made it financially impossible to continue operating their parks, the City made it financially impossible for the parks to go out of business, because of the City's strong interest in not losing any of its mobilehome parks.

45.     But Little Woods and Youngstown are privately-owned businesses, operated by privately-owned entities, on privately-owned land, subject to private rental agreements between the park and private mobilehome owners.  Those contracts explicitly affirm the park owner's right to cease business operations, and explicitly affirm that the park owner has no duty to compensate the mobilehome owner for the inflated "in-place" value of their home.  Despite the City's efforts to prevent Little Woods and Youngstown from closing, the park owners retain the contractual and constitutional right to close their parks, particularly when the City has made it economically impossible to continue operating because of its Rent Control Law

### **B.     Little Woods**

46.     Little Woods has 78 mobilehome spaces. None of the leases or rental agreements with homeowners precludes Little Woods' decision to convert the park to another land use or to simply close operations. All leases and rental agreements allow homeowners to rent park spaces for a defined term, reflecting the inherent risk and eventuality that the park may one day close.

47.     Because of the Rent Control Law, the park must close—and has taken concrete steps reflecting its willingness and ability to do so. However, Little Woods has been forced to remain in business because of the cost-prohibitive requirements that it must meet before closure can occur.

48.     In July 2023, Little Woods served a letter on each homeowner at the park stating that the

park was considering whether it was viable to continue operating as a mobilehome park. The letter explained that the park was exploring the option of closing. The letter further explained that the park engaged the services of an independent consulting agency specializing in community development and resident relocations, Autotemp Services, who would contact all homeowners to schedule interviews necessary for the park's preparation of the relocation impact report related to the potential closure of the park. The letter asked for homeowners' cooperation in being interviewed by the consultant.

49.     In August 2023, Little Woods served another letter to all park homeowners. This letter reiterated that the park was still assessing the possibility of closing the park and asked for the homeowners' continued cooperation in being interviewed by the consultant, Autotemp.

50.     Despite best efforts, Little Woods has been unable to complete all interviews with homeowners, in part because of the lack of meaningful cooperation on their part. This has thwarted Little Woods' ability to complete the required relocation impact report—and, ultimately, its ability to exercise its right to cease operations. On July 17 and July 20, 2023, Autotemp visited the park to conduct interviews. Autotemp knocked on 61 doors. Out of those who answered, only 14 agreed to be interviewed. Autotemp returned on September 6 to conduct additional interviews. Autotemp knocked on 40 doors. Out of those who answered, 3 refused to be interviewed, and only 2 residents agreed to be interviewed.

51.     Little Woods cannot complete the impact report. And it cannot satisfy other pre-closure requirements, including the cost-prohibitive requirement that it pay all residents the in-place value of their mobilehomes. Thus, the City has barred Little Woods from exercising its right to close. Little Woods has been compelled, against its will and economic interest, to continue in operation.

**C.     Youngstown**

52.     Youngstown has 102 mobilehome spaces. None of the leases or rental agreements with park homeowners precludes Youngstown's decision to convert the park to another land use or to simply close operations. All leases and rental agreements allow homeowners to rent park spaces for a defined term, reflecting the inherent risk and eventuality that the park may one day close or convert to another use.

53.     Because of the Rent Control Law, the park must close—and has taken concrete steps reflecting its willingness and ability to do so. However, it has been forced to remain in business because

of the cost-prohibitive requirements that must be met before closure can occur.

54.     In July 2023, Youngstown served a letter on all homeowners regarding potential closure. The letter stated that the park was considering whether it was viable to continue operating as a mobilehome park given the aging infrastructure and the increasing costs of operating the park (such as utilities, insurance, property tax, and maintenance and repairs). The letter advised homeowners that the park had retained the services of Autotemp to conduct interviews in order to prepare a relocation impact report related to the potential closure of the park and requested homeowners' cooperation in that regard.

55.     In August 2023, Youngstown served a similar letter on all homeowners, reiterating that the park was considering the option of ceasing operations as a mobilehome park and asking for homeowners' continued cooperation in being interviewed by Autotemp.

56.     Despite best efforts, Youngstown has been unable to complete all interviews with homeowners, in part because of the lack of meaningful cooperation on their part. This thwarted Little Woods' ability to complete the required relocation impact report—and, ultimately, its ability to exercise its right to cease operations. On July 18, July 19, and July 20, 2023, Autotemp visited the park to conduct interviews. Autotemp knocked on 65 doors. Out of those who answered, ***29 residents refused to be interviewed***, and only three agreed to be interviewed. Autotemp returned on September 6 to conduct additional interviews. Autotemp knocked on 54 doors. Out of those who answered, ***26 refused to be interviewed***, and only 2 residents agreed to be interviewed.

57.     Youngstown cannot complete the impact report. And it cannot satisfy other pre-closure requirements, including the cost-prohibitive requirement that it pay all residents the in-place value of their mobilehomes. Thus, the City has barred Youngstown from exercising its right to close. Youngstown has been compelled, against its will and economic interest, to continue in operation.

### D.     Pre-Closure Requirements Prevent Little Woods and Youngstown from Closing

58.     Little Woods and Youngstown have concluded that, given the extraordinarily-burdensome requirements and preconditions to closure, as described above—especially the compelled payment to every displaced resident of the in-place value of his or her mobilehome—it would be cost-prohibitive for the parks to proceed with the closure process. Thus, Little Woods and Youngstown have been deprived of their right to close.

59.     Especially given the obligation to pay homeowners the in-place value of their mobilehomes, going through with a closure (even if approved by the City) would result in the parks having a negative value. The parks do not have the funds to pay out the in-place value of the residents' mobilehomes. The parks would need to save all of their profits for the next **couple hundred years** in order to accrue enough money to pay homeowners the "in-place" value of their homes. But the parks do not have the luxury of waiting two centuries to accrue cash. Due to the City's Rent Control Law, the parks need to close before they become insolvent.

60.     Further, given the severe shortage of mobilehome spaces in the City and County, and the fact that park closure would result in or materially contribute to a shortage of housing opportunities for low- and moderate-income households within the City and County, Little Woods' and Youngstown's application to the City for closure would necessarily be met with (1) outright denial or (2) the impossible requirement that it pay each displaced resident the in-place value of his or her mobilehome as the condition of closure, thereby constructively denying the closure.

## FIRST CLAIM

## AS-APPLIED VIOLATION OF THE FEDERAL TAKINGS CLAUSE

## (U.S. Const. amends. V & XIV)

61.     Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

62.     The Takings Clause of the Fifth Amendment to the United States Constitution prohibits the taking of "private property . . . for public use, without just compensation." "[O]ne of the most fundamental elements of property ownership" protected by the Takings Clause is "the right to exclude." *See, e.g., Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (recognizing the fundamental right to make economically beneficial and viable use of private property). A physical taking occurs when the government "*requires* the landowner to submit to the physical occupation of his land" as when it "compels" owners—"once they have rented their property to tenants, to continue doing so." *Yee v. City of Escondido*, 503 U.S. 519, 527-28 (1992); *see also Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021) (making clear that the government appropriation of an owner's fundamental property rights constitutes a *per se* physical taking).

63.     Because of the City's Rent Control Law, which has made it economically infeasible to continue park operations, Little Woods and Youngstown seek to close their parks. They are ready, willing, and able, and have taken concrete steps, to do so.

64.     However, the City's pre-closure requirements, applied in conjunction with the MRL and PZL, operate to bar Little Woods and Youngstown from closing and to instead compel the parks to continue leasing their land to mobilehome owners against the parks' will and at continued economic loss. In particular, the condition that Little Woods and Youngstown pay each of their residents the "in place" value of their mobilehomes is economically impossible to achieve—a feature, not a bug, of the pre-closure requirements—and thereby eliminates the parks' right to exclude.

65.     There is no mechanism for compensating Little Woods and Youngstown for the taking of their property rights, and they have no adequate remedy at law.

## SECOND CLAIM

## AS-APPLIED VIOLATION OF

## THE FEDERAL UNCONSTITUTIONAL CONDITIONS DOCTRINE

## (U.S. Const. Amends. V, XIV)

66.     Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

67.     Under the "unconstitutional conditions" doctrine as applied in the Takings Clause context, the government may not impose a condition, requiring the relinquishment of land or money, on the exercise of a property right, unless the government first establishes an "essential nexus" and "rough proportionality" between the condition and the purported public impacts caused by the exercise of the property right. *Koontz v. St. Johns River Water Mngmt. Dist.*, 570 U.S. 595, 605-06 (2013); *see also Nollan v. Cal. Coastal Comm.*, 483 U.S. 825, 837 (1987) (requiring an "essential nexus" between the public impacts on beach access directly caused by a landowner's proposed use of his property, and the government's demand for an easement); *Dolan v. City of Tigard*, 512 U.S. 374, 391 (1994) (requiring "rough proportionality" between the public impacts of a landowner's proposed use of his land and the government's demand for an easement). If the government's condition fails either the "nexus" or "rough proportionality" test, the condition is deemed a purported unconstitutional taking of private property

without compensation—or, in the words of the Supreme Court, an "out-and-out plan of extortion." *Nollan*, 483 U.S. at 837.

68.     Because of the Rent Control Law, which has made it economically infeasible to continue park operations, Little Woods and Youngstown seek to close their parks. They are ready, willing, and able, and have taken concrete steps, to do so. Closure will cause all residents to have to move their mobilehomes to another location or find alternative housing. There are not parks with vacancies in the County.

69.     Further, before closing, Little Woods and Youngstown must obtain the City's approval. One condition of approval is that the parks pay all displaced residents the "in-place" value of their mobilehomes, since there are no available spaces at other mobilehome parks in the City or the County to which said residents could move their mobilehomes and, as a consequence, there is no "adequate housing in another mobilehome park."

70.     However, said approval condition does not bear an essential nexus or rough proportionality to any public impacts caused by Little Woods' and Youngstown's closure, including without limitation for the following reasons:

   a.   First, closing a park does not inflict on a resident any impacts that are not otherwise inherent in a leasehold. A leasehold does not give any resident at Little Woods and Youngstown a permanent fee simple in the space they lease or rent. By its nature, a leasehold is temporary and inherently reflects the risk that a resident may need to relocate—a risk that the resident accepts when they execute a lease or rental agreement, and a risk that is enshrined in the MRL. Thus, the need for a displaced resident to relocate following Little Woods' and Youngstown's closure would be caused, not by the parks' closure as such, but by the very terms and conditions of the agreed-to lease or rental agreement, which does not condition the parks' right to cease operations on the cost-prohibitive payment of the in-place value of residents' mobilehomes. Indeed, displaced residents already have received the benefit of the bargained-for rental agreement by receiving years of occupancy with highly affordable rents. In sum, the requisite nexus does not exist between the parks' closure and the condition imposed.

*Levin v. City & County of San Francisco*, 71 F. Supp. 3d 1072 (N.D. Cal. 2014) (finding that a variety of complex factors determines the conditions of the rental housing market and its effects on tenants); *Coyne v. City & County of San Francisco,* 9 Cal. App. 5th 1215, 1230 (2017) (finding that "spiraling rents had no relationship to the adverse impacts caused by a landlord's decision to exit the rental market").

b.   Second, even if it were fair to characterize the parks' closure as the parks causing adverse impacts on residents, those impacts would be strictly ***private*** impacts—not public ones that the government has the authority to mitigate. The government is entitled only to mitigate against "public impacts" caused by a property's use or disposition. *San Remo Hotel v. City & County of San Francisco*, 27 Cal. 4th 643, 671 (2002). It is not entitled to mitigate against purely private ones. Further, the City cannot compel Little Woods and Youngstown, as private landowners, to bear society's burden of remedying the City's housing-availability or housing-affordability issues. In the grand scheme, Little Woods and Youngstown are small landowners with an infinitesimal share of the rental units in Petaluma, Sonoma County, and the State in general.

c.   Third, assuming *arguendo* that the requisite nexus exists and that park owners must bear the burden of remedying private impacts, there is no rough proportionality between the impacts of the parks' closure and the pre-closure conditions. Prior to AB 2787, state law required that any mitigation not exceed the reasonable cost of relocation. AB 2782 struck that limitation, thereby eliminating any pretense of a "proportionality" standard. The requirement to pay residents the in-place value of their mobilehomes is substantially disproportionate to the actual impacts to displaced residents of park closure. As explained above, the in-place value of a mobilehome in Little Woods and Youngstown is massively inflated by rent control—to the tune of 10 or more times the home's value in isolation.  This inflated value is a direct result of the City's Rent Control Law.  It would be a miscarriage of justice if the ***same*** City that are driving these parks out of business (by artificially keeping lot rents below the cost of

inflation) were allowed to condition closure on payment of out artificially high in-place home values—which, again, are a direct result of the Rent Control Law and which the parks will not be able to afford for the next 200 years because the City's Rent Control Law has strangled the parks' source of income.

d.   Fourth, finding "adequate housing in another mobile home park" is by no means necessary to re-house former mobilehome park residents. There are 208,462 housing units in Sonoma County, according to the 2022 U.S. Census.  Of these 208,462 housing units, 8,213 are mobilehome lots in mobilehome parks, according to California Department of Housing and Community Development data. Mobilehome lots comprise less than 4% of Sonoma County's housing supply. In other words, mobilehome parks constitute an almost immaterial fraction of the county's housing supply. There are approximately 200,000 non-mobilehome housing units in the county—including subsidized apartments, market-rate apartments, senior housing, and other housing types—which can house former residents of Youngstown and Little Woods, even if there are no vacant mobilehome lots available in the county.

71.   The condition has the effect of pressing Little Woods and Youngstown's plots of land into public service as public housing—which the City is loath to lose—thereby depriving the parks of their constitutional right to exclude and make alternative use of their properties.

72.   For these reasons, the condition requiring payment of the in-place value of mobilehomes fails the "nexus" and "rough proportionality" tests of *Nollan* and *Dolan*, and therefore violates the unconstitutional conditions doctrine.

## THIRD CLAIM

## AS-APPLIED VIOLATION OF THE CONTRACTS CLAUSE

## (U.S. Const. art. I, § 10, cl. 1)

73.   Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

74.   The Contracts Clause of the United States Constitution prohibits states from passing "any . . . Law impairing the Obligation of Contracts." U.S. Const., Art. I, §10, cl. 1.

75.     First, the court will determine whether the law "operate[s] as a substantial impairment of a contractual relationship." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978). "In answering that question, the Court has considered the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018).

76.     Second, the court considers "whether the [challenged] law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Sveen*, 138 S. Ct. at 1822 (quoting *Energy Reserves Group, Inc. v. Kansas Power & Light Co*., 459 U.S. 400, 411-412 (1983)). Significantly, a law serving no "broad societal interest" and having only "an extremely narrow focus" does not advance a significant and legitimate public purpose. *Allied Structural Steel Co. v. Spannaus* (1978) 438 U.S. 234, 248-49. Further, impairment is unreasonable when "an evident and more moderate course would serve [the State's] purposes equally well." *U.S. Trust Co. of N.Y. v. N.J.*, 431 U.S. 1, 31.

77.     Once a substantial impairment is shown, the burden shifts to the government to establish that the law is sufficiently tailored to advance a significant and legitimate public purpose.

78.     Here, the condition requiring payment of the in-place value of mobilehomes to displaced residents substantially impairs the leases and rental agreements executed between Little Woods and Youngstown, on the one hand, and their residents, on the other. The essential bargain in all those contracts consists of the conveyance of a temporary ***leasehold***—and no more—in exchange for monthly rent. However, by rendering it cost-prohibitive for Little Woods and Youngstown to cease operations, the condition effectively and retroactively creates a permanent interest or right in the leased or rented spaces, in substantial contravention of the parties' agreements. The condition interferes with Little Woods' and Youngstown's reasonable expectations that they were conveying a leasehold, not a fee simple. Neither Little Woods nor Youngstown could ever have anticipated that their contracts would be so substantially and retroactively impaired in this way.

79.     Nor is the "in-place value" condition drawn in an "appropriate" and "reasonable" way to advance "a significant and legitimate public purpose." Indeed, AB 2782 was enacted without any findings to support a significant and legitimate public purpose of any kind. The findings are based on a public health emergency—COVID-19—that has come and gone. Indeed, the legislative findings declare that

"emergency action" is needed to prevent displacement of renters "who have fallen behind on space rental payments," causing people to become "homeless," unhygienic, and unable to "comply with public health orders related to social distancing and self-quarantining." But those findings describe alleged past events that already occurred by the time of the law's enactment. The findings do not explain how those who had (purportedly) fallen behind on rent or became homeless prior to the law's enactment could be helped by AB 2782. And there are no findings to support the allegation that "[t]here is a current and immediate threat to the public health, safety and welfare of California residents and a need for the immediate preservation of the public peace, health, and safety" that warrants making it economically impossible for a park, like Little Woods and Youngstown, to exercise its contractual and constitutional right to cease operations—as each and every mobilehome owner at those parks acknowledged and agreed could occur.

80.     The condition serves no "broad societal interest" and has only the "extremely narrow focus" of benefitting a discrete class of private interests. *Allied Structural*, 438 U.S. at 248-49.  In fact, the condition is designed, in purpose and effect, either (1) to prevent a park's closure altogether, or (2) to grossly and unfairly enrich each displaced resident by forcing the park to pay the resident an artificially inflated price for his or her mobilehome, to which the resident is not entitled by law or contract. Neither is a legitimate public purpose.

<u>**FOURTH CLAIM**</u>

<u>**AS-APPLIED VIOLATION OF THE TAKINGS CLAUSE**</u>

<u>**(U.S. Const., amends. V & XIV)**</u>

81.     Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

82.     Under *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), and *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021), a law "constitutes a *per se* physical taking" when it "appropriates for the enjoyment of third parties [a property] owner['s] right to exclude." *Id.* at 2072.  Under *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992), a taking also can occur when an owner is deprived of all "economically viable" or "beneficial use" of their property.

83.     In addition, regulatory action may be deemed to be the functional equivalent of a *per se* taking after weighing all relevant factors, including: (1) "[t]he economic impact of the regulation on the

claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978).

84. The Rent Control Law effects a *per se* taking because it transfers a possessory interest in each homesite at Little Woods and Youngstown to the mobilehome owner, whose mobilehome occupies the homesite. Because of the pre-closure requirements that render it economically infeasible to cease operations, said possessory interest consists of the right to occupy the plot of land in perpetuity while paying only a fraction of what it is worth in rent. Said possessory interest is transferable, has an established market and market value, which—given vacancy control—the homeowner fully realizes upon sale of the mobilehome. The Rent Control Law effectively compels Little Woods and Youngstown to suffer a physical occupation without compensation, thereby violating the Takings Clause.

85. Further, when coupled with the City's constructive prohibition on park closures, the Rent Control Law effectuates a *Lucas* taking, because it leaves parks, including Youngstown and Little Woods, with no economically viable or beneficial use of their lands.

86. Even if not a *per se* taking, the Rent Control Law effects a regulatory taking of Little Woods' and Youngstown's property. The Rent Control Law has caused a substantial diminution in value of the parks. Without rent control, lot rent would be approximately $1800 per lot per month; under rent control, lot rent is approximately $750 per lot per month. This diminution in value of $1,050 per lot per month equates to $12,600 of lost revenue per lot per year. Mobilehome parks such as Little Woods and Youngstown are typically valued using a multiple ranging from 15 times earnings to 25 times earnings. Thus, the diminution in value due to the Rent Control Law is in the range of $189,000 to $315,000 per lot. At Little Woods, which is 78 lots, this equates to roughly $14,000,000 to $24,000,000 in total diminution of value. At Youngstown, which is 102 lots, this equates to roughly $19,000,000 to $32,000,000 in total diminution of value.

87. Further, the law has substantially interfered with the parks' reasonable investment-backed expectations, especially when combined with the pre-closure requirements that bar the parks' closure. The owners of Little Woods and Youngstown could not reasonably have expected that the Rent Control Law would force the parks to cease operations by barring the parks from keeping up with the cost of inflation.

Finally, the Rent Control Law was enacted specifically to assist a discrete group of persons—i.e. mobilehome owners whose homes were installed in parks in Petaluma—uniquely and exclusively at the expense of park owners like Little Woods and Youngstown. The Rent Control Law violates the premise of the Takings Clause, which was "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

88. The Rent Control Law effectuates a *per se* or regulatory taking without actual compensation or the prospect of compensation. There is no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request relief as follows:

1. A declaratory judgment that the requirement that Little Woods and Youngstown pay displaced residents the in-place value of their mobilehomes, as the condition of approval of the parks' closure, is unconstitutional;

2. A declaratory judgment that the Rent Control Law is unconstitutional;

3. A temporary, preliminary, and permanent injunction enjoining the City, and all those in active concert or participation with them, from imposing the "in-place value" requirement as a precondition of Little Woods' and Youngstown's closure;

4. A temporary, preliminary, and permanent injunction enjoining the City, and all those in active concert or participation with them, from imposing the Rent Control Law on Little Woods and Youngstown;

5. Reasonable attorneys' fees and costs incurred in this action pursuant to *inter alia* 42 U.S.C. § 1988; and

6. Any and all other relief that the Court may deem just and proper.

DATED: October 10, 2023          **FISHERBROYLES LLP**


                                 s/ Paul Beard II

                                 _____
                                 Attorneys for Plaintiffs LITTLE WOODS MOBILE VILLA LLC
                                 and YOUNGSTOWN MHP LLC