1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LITTLE WOODS MOBILE VILLA
LLC et al.,

              Plaintiffs,

      v.

CITY OF PETALUMA et al.,

            Defendants.

Case No.  3:23-cv-05177-CRB-1

**ORDER GRANTING MOTION TO DISMISS**

Before the Court is Defendant City of Petaluma's motion to dismiss (dkt. 16).  For the reasons that follow, the motion is granted.

## I.      BACKGROUND

Plaintiffs are two limited liability companies that own mobile home parks in Petaluma.  Compl. (dkt. 1) ¶¶ 4–5.  This case involves claims that the City of Petaluma (the "City") has regulated mobile home parks in a way that violates Plaintiffs' constitutional rights under the U.S. Constitution's Takings Clause—under a per se physical takings theory, a regulatory takings theory, and a Nollan/Dolan exaction theory—as well as the Contracts Clause.  The challenged laws are a City of Petaluma (the "City") rent control ordinance and a legal regime that makes it difficult for mobile home park owners to close their parks or convert them to other uses.

Some of Plaintiffs' claims are directed at only one of these laws—the rent control ordinance, the closure regulations, or—for the Contracts Clause claim—a specific aspect of a state law that imposes conditions on mobile home closures.  But the core of Plaintiffs'

takings theory is about how the laws act together.  That is, Plaintiffs allege that it is economically infeasible to continue operating their parks because the City's rent-control ordinance prevents Plaintiffs from raising rents to keep up with inflation and the cost of insurance.  Id. ¶ 63.  So Plaintiffs "seek to close their parks."  Id.  But the park closure regulations allegedly prevent them from doing so: the regulations create obstacles to closure, and they ultimately contemplate the imposition of hefty relocation fees if closure would result in the displacement of existing park residents.  Plaintiffs allege that, under present circumstances, these requirements make it effectively impossible for them to close.  Thus, Plaintiffs say, they are being forced to operate their parks at an "economic loss."  Id. ¶ 64.

### A.    Legal Background

#### 1.    The Rent Control Law

There are three legal provisions at the center of this case.  First, there is the City's "Mobilehome Park Space Rent Stabilization Program" (the "Rent Control Law").  See Petaluma Municipal Code ("PMC") § 6.50.010, et seq.  For the purposes of this litigation, the Rent Control Law has three important features.  First, it limits the amount by which mobile home park owners can increase annual rent.  Owners can increase rents by no more than 70% of the change in the local Consumer Price Index or 4% of the previous year's rent, whichever is less.  PMC § 6.50.040(A).  Second, the Law allows the owner to reset the base rent for a given lot only under limited circumstances, with the result that ordinarily a new tenant must inherit the same rent as the previous tenant.  PMC § 6.50.220.  Third, the Law allows a park owner to apply for an increase in rent above the prescribed limits.  If the park owner applies for an increase, the City will choose an arbitrator, who conducts an adversarial hearing involving the park owner and the interested residents.  Then the arbitrator decides whether and by how much to allow an additional rent increase.  PMC § 6.50.060.

#### 2.    The State Planning and Zoning Law

Second, there is a state statute that governs mobile home park closures: the Planning

2

and Zoning Law ("PZL").  See Cal. Gov't Code § 65863.7.  This law establishes requirements with which owners must comply before closing their mobile home parks or converting the parks to other uses.  Two requirements are especially relevant to this case.  First, owners seeking to close their parks must complete and file "a report on the impact of the conversion, closure, or cessation of use of the mobilehome park," something the parties refer to as a "relocation impact report."  Id. § 65863.7(a)(1).  Such reports must "include a replacement and relocation plan that adequately mitigates the impact upon the ability of the displaced residents of the mobilehome park to be converted or closed to find adequate housing in a mobilehome park."  Id.  Second, where the relocation impact report reveals that displaced residents would not be able to "obtain adequate housing in another mobilehome park," the park owner must compensate them.  Id. § 65863.7(a)(2)(A).  Specifically, the park owner "shall pay to the displaced resident the in-place market value of the displaced resident's mobilehome."  Id.  The "in-place market value" of the mobile home refers to the home's value on the lot where it is currently located.  According to the complaint, the in-place value of a mobile can be as much as ten times the "inherent value" of the mobile home—that is, the bluebook value of the mobile home itself, unlinked to any specific mobile home lot.  Compl. ¶ 22.  The reason the in-place value is usually so high is that it prices in things like the location of the lot, the amenities in a given park, and the scarcity of other available mobile home lots in the region.  See id. ¶¶ 22–23.  The Court will refer to this compensation requirement as the "in-place value condition."

The PZL was most recently amended as of January 1, 2021, in response to the COVID-19 pandemic.  Prior to the amendment, the PZL was somewhat less stringent from the perspective of park owners.  For example, it required that "[t]he steps required to be taken to mitigate shall not exceed the reasonable costs of relocation," theoretically imposing a cap on the amount that a park owner (or another entity seeking to close a mobile home park) could be made to pay to mitigate of the effects of the closure.  See Cal. Gov't Code § 65863.7(e) (2009) (West).  This requirement has been eliminated from the current version of the PZL.  The in-place value condition was also an addition of the 2021

1 amendment to the PZL. The prior version of the law allowed localities to require that park

2 owners take steps to mitigate displacement, but the language was permissive and did not

3 specify the steps that could or should be imposed. See id. The 2021 amendment also

4 added a provision stating that the law sets forth a "a minimum standard for local regulation

5 of the conversion of a mobilehome park to another use, the closure of a mobilehome park,

6 and the cessation of use of the land as a mobilehome park," but does not "prevent a local

7 agency from enacting more stringent measures." Cal. Gov't Code § 65863.7(k) (2021)

8 (West).

### 3.    The City's Park Closure Ordinance

10      Finally, there is the City of Petaluma's ordinance governing mobile home park

11 closures. Like the PZL, the City ordinance requires owners who wishes to close down

12 their mobile home parks to apply to the City to do so, and as part of this process it requires

13 the preparation of a "relocation impact report." PMC §§ 8.34.050(A), 8.34.080(A). The

14 impact report must contain information about the park's condition, the tenants' names and

15 descriptions of their mobile homes, the location of all comparable mobile home parks

16 within Sonoma County, a roster of mobile homes that can be relocated to other parks and

17 the estimated relocation costs, the fair market value of mobile homes that cannot be

18 relocated, a relocation plan for physically relocating the mobile homes or payment of

19 relocation assistance, and proposed measures to mitigate adverse impacts from the closure.

20 See id. § 8.34.050(C). On receiving the park closure application, the city council considers

21 it, along with the relocation impact report, and issues a written decision. In considering an

22 application, the council may accept and hear evidence, and it must consider a variety of

23 factors, including whether the relocation impact report is complete and contains adequate

24 information, whether other housing options are available for residents who would be

25 displaced by the closure, whether the park owner's "relocation plan" provides for the

26 reasonable costs of relocation, and whether the proposed conversion "will not be

27 detrimental to the public health, safety and general welfare." PMC § 8.34.090. If the City

28 approves the closure, it "may attach reasonable conditions" to mitigate the impacts of the

United States District Court
Northern District of California

4

closure, which may include things like the payment of relocation assistance to the residents, or where relocation is not reasonably possible, "payment of fair market value for [the resident's] mobilehome." PMC § 8.34.100.

Notably, the City closure ordinance differs from Cal. Gov't Code § 65863.7, the California law that it ostensibly implements. For example, the City ordinance retains the requirement that "[t]he specific conditions of approval of a particular application shall be determined on an application-by-application basis with regard to the acts and circumstances of the application, but shall not exceed the reasonable cost of relocation." PMC § 8.34.100 (emphasis added). As noted, that requirement was eliminated from the PZL in 2021. The City closure ordinance also describes the imposition of mitigation conditions as a matter of the City's discretion. See id. And the City ordinance does not contain the mandatory in-place value condition found in the PZL. Instead, the City closure ordinance describes a variety of factors that the city council "may" take into account in determining what "reasonable conditions" to impose on park closure. See PMC § 8.34.100.

**B.     Little Woods and Youngstown's Desire to Close**

Plaintiff Little Woods Mobile Villa LLC ("Little Woods") owns a mobile home park with 78 lots, and Plaintiff Youngstown MHP LLC ("Youngstown") owns a park with 102 lots. Compl. ¶¶ 46, 52. The factual allegations concerning both entities are essentially the same.

Little Woods and Youngstown allege that the City's Rent Control Law has "made it economically infeasible to continue park operations" in both parks, and both parks therefore desire to close. Id. ¶ 68.[1] In July 2023, both park owners served letters on each of their residents stating that they were exploring the option of closing, and that they had

---

[1] The best reading of the complaint seems to be that Plaintiffs are currently making some profit; they are careful to say they are forced to operate at an "economic loss" rather than simply a "loss." See Compl. ¶¶ 25, 64. But the complaint also suggest that Plaintiffs fear they could eventually be forced into bankruptcy if they continue to be unable to raise rents as necessary to keep up with inflation and other costs. See id. ¶ 20(b).

United States District Court
Northern District of California

retained an independent consulting agency to contact the homeowners for interviews to gather information required by the relocation impact report.  Id. ¶¶ 48, 54.  A subsequent letter to the same effect was sent in August 2023.  Id. ¶¶ 49, 55.  In both cases, the consultants allegedly had difficulty securing the cooperation of residents, despite knocking on doors on several occasions.  Id. ¶¶ 50, 56.  Significant numbers of residents refused to be interviewed, and others simply failed to answer their doors; only a small portion of the residents of each park agreed to be interviewed.  Id.  Because of this, Plaintiffs allege that they are unable to complete the required impact reports, and thus will be unable to complete a satisfactory application for closure.  Moreover, they allege that even if they could complete the reports, they could never "satisfy other pre-closure requirements, including the cost-prohibitive requirement that it pay all residents the in-place value of their mobile homes."  Id. ¶¶ 51, 57.  Under the PLZ, payment of the in-place value condition is required only if there is a lack of adequate alternative mobile home housing for displaced park residents.  But Plaintiffs allege that there is no such housing available in Sonoma County.  See id. ¶¶ 58–60.  Mobile home parks in Sonoma County "are in very short supply," the existing parks have long waiting lists, and "[t]he closure of any mobilehome park in the City or County . . . would [necessarily] result in or materially contribute to a shortage of housing opportunities for low- and moderate-income households within the City and County."  Id. ¶¶ 40–41, 60.  So Plaintiffs say they are stuck: they cannot pay the fee that would inevitably be imposed on them if they applied to close their parks, and they are therefore forced to operate their parks at an "economic loss" because of the Rent Control Law.  Id. ¶ 64.

### C.    Causes of Action

Plaintiffs bring four claims.  Count 1 asserts an as-applied violation of the federal Takings Clause on the grounds that the park closure regulations have "eliminate[d] the parks' right to exclude."  Count 2 asserts another as-applied Takings Clause challenge to the Anti-Closure Law based on an unconstitutional conditions/exaction theory.  Count 3 asserts a claim under the Contracts Clause on the theory that the PZL's "in-place value

6

1    condition" impaired the Plaintiffs' leases with its residents.  Count 4, finally, is another

2    Takings Clause claim aimed at the Rent Control Law and based on both per se and

3    regulatory takings theories.  Plaintiffs seek declaratory and injunctive relief.

4        The City's motion to dismiss argues that Plaintiffs' takings claims are not ripe, that

5    Plaintiffs lack standing to assert their Contracts Clause claim against the City, and that

6    Plaintiffs have failed to state a claim.

7    ## II.    LEGAL STANDARD

8        A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the

9    court's subject matter jurisdiction over the asserted claims.  It is the plaintiff's burden to

10   prove jurisdiction at the time the action is commenced.  Tosco Corp. v. Communities for

11   Better Environment, 236 F.3d 495, 499 (9th Cir. 2001); Morongo Band of Mission Indians

12   v. Cal. State Bd. of Equalization, 858 F.2d 1376, 1380 (9th Cir. 1988).  A court

13   considering a 12(b)(1) motion to dismiss is not limited to the pleadings, McCarthy v.

14   United States, 850 F.2d 558, 560 (9th Cir. 1988), but may rely on extrinsic evidence to

15   resolve factual disputes relating to jurisdiction.  St. Clair v. City of Chico, 880 F.2d 199,

16   201 (9th Cir. 1989).

17       Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a

18   complaint if it fails to state a claim upon which relief can be granted. To survive a Rule

19   12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief

20   that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A

21   claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the

22   reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v.

23   Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).  There must be "more than a sheer

24   possibility that a defendant has acted unlawfully." Id.

25   ## III.   DISCUSSION

26   ### A.    Request for Judicial Notice

27       The City requests that the Court take judicial notice of various items.  See Request

28   for Judicial Notice in Support of Motion to Dismiss (dkts. 17, 25).  These include (1) the

United States District Court
Northern District of California

relevant City of Petaluma ordinances, (2) California Assembly Bill 2782, (3) recorded grant deeds and property records showing the dates Plaintiffs acquired their respective mobile home parks, and (4) a complaint filed in a state court action by Plaintiffs' counsel on behalf of an association of mobile home park owners.  Plaintiffs do not oppose (or otherwise address themselves to) these requests.  The Court takes judicial notice of the City ordinances, the Assembly Bill, and the public records showing when Plaintiffs acquired their parks, all of which are proper subjects for judicial notice.  See Fed. R. Evid. 201; Tollis, Inc. v. County of San Diego, 505 F.3d 935, 938 n.1 (9th Cir. 2007); Ortiz-Luis v. Fed. Home Loan Mortg. Corp., No. 21-CV-989-CAB-AHG, 2021 WL 3533059, at *2 (S.D. Cal. Aug. 11, 2021) ("Public property records may be judicially noticed.") (citing Disabled Rights Action Comm. v. Las Vegas Events, Inc., 375 F.3d 861, 866 n.1 (9th Cir. 2004)).

No part of the Court's order relies on any of the other extrinsic materials.

## B.      Ripeness of the Takings Claims

Plaintiffs disavow any attempt to bring facial takings challenges to the Rent Control Law and the closure requirements.  They insist, instead, that they "plead only as-applied takings claims."  Opp'n (dkt. 23) at 14 (emphasis in original).

This being so, Plaintiffs' claims are subject to the ripeness requirements governing as-applied takings claims.  "When a plaintiff alleges a regulatory taking in violation of the Fifth Amendment, a federal court should not consider the claim before the government has reached a 'final' decision."  Pakdel v. City and Cnty. of San Francisco, 594 U.S. 474, 475 (2021) (citing Suitum v. Tahoe Regional Planning Agency, 520 U.S. 725, 737 (1997)).  To satisfy this requirement, "all a plaintiff must show is that 'there [is] no question . . . about how the 'regulations at issue apply to the particular land in question.'"  Id. at 478 (quoting Suitum, 520 U.S. at 739).  In other words, only "de facto finality is necessary": "once the government is committed to a position . . . the dispute is ripe for judicial resolution."  Id. at 479.  Administrative exhaustion is never required, although failure to exploit available procedures "may render a claim unripe if avenues still remain for the government to clarify

1    or change its decision." Id. at 480 (emphasis in original) (citing Williamson Cnty. Regl.

2    Plan. Comm'n v. Hamilton Bank, 473 U.S. 172, 192–94  (1985); Knick v. Township of

3    Scott, 588 U.S. 180, 188 (2019); Palazzolo v. Rhode Island, 533 U.S. 606, 624–25 (2001)).

4        Plaintiffs have not actually applied to the City for any relief, either by seeking to

5    raise rents above the annual increase allowed under the Rent Control Law or by applying

6    to the City to close down their parks.  Plaintiffs argue that the results of any applications to

7    the City are foregone conclusions and that any application would be an exercise in futility.

8    But it is not clear that this is so.  More fundamentally, no cases—Pakdel included—

9    support Plaintiffs' view that the ripeness requirement can be satisfied where a plaintiff

10   takes no action at all, and instead merely alleges that all of the available processes would

11   be futile and expensive.  See, e.g., Ralston v. County of San Mateo, Case No. 21-cv-

12   01880-EMC, 2021 WL 3810269, at *7 (N.D. Cal. Aug. 26, 2021) ("Plaintiffs do not cite a

13   single analogous case where a court concluded that a state agency reached a 'final

14   decision' before the landowner even applied for a permit or submitted a substantive

15   proposal to develop the property.").  The case law, including Pakdel and subsequent

16   decisions applying it, is to the contrary.  In Pakdel itself, for example, the city had

17   definitively rejected the landowners' request that they be excused from executing the

18   lifetime lease or that they be compensated for it.  See Pakdel at 475.  The landowners there

19   had failed to follow the proper procedures in a way that all but guaranteed that their

20   request would be denied.  Nevertheless, the Court held that their claims were ripe; the

21   response they had gotten from the city was enough for "de facto finality."  Id.

22   Nevertheless, the Pakdel landowners had actually asked the City for relief and been

23   informed of an adverse decision.  Plaintiffs here have not even done that.

24       Lower courts applying Pakdel have continued to require landowners to obtain some

25   form of decision from the relevant entity concerning the application of the challenged law.

26   Indeed, litigants who have gone to greater lengths than Plaintiffs here have had their

27   claims dismissed as unripe.  See, e.g., Lustig v. City of Laguna Beach, No. 8:22-CV-

28   01945-DOC-ADS, 2023 WL 6370231, at *5 (C.D. Cal. Aug. 10, 2023) (dismissing takings

9

United States District Court
Northern District of California

1 claims as unripe where the plaintiffs had failed to reach the "latter stages of the application

2 process," despite their having received a "preliminary" letter from the city stating that the

3 proposed project was infeasible); <u>DiVittorio v. Cnty. of Santa Clara</u>, No. 21-CV-03501-

4 BLF, 2022 WL 409699, at *7 (N.D. Cal. Feb. 10, 2022) ("Unlike the <u>Pakdel</u> plaintiffs,

5 who sued at the end of the administrative process, the DiVittorios have elected to sue in

6 the middle of the administrative process when 'avenues still remain for the government to'

7 render a decision favorable to them."); <u>Ralston</u>, 2021 WL 3810269 at *6 (dismissing

8 takings claims as unripe where the county's zoning regulations required submission of an

9 application along with a fee, a location map, a site plan, and building elevations, and the

10 plaintiffs had not alleged that they did any of those things).  After <u>Pakdel</u>, the finality

11 requirement is "modest," but it is still a finality requirement: where there has been no

12 decision at all from the government and no effort to seek one, Plaintiffs' claims cannot be

13 ripe.  See <u>Pakdel</u>, 594 U.S. at 478.[2]

14     This reading of <u>Pakdel</u> is also most consistent with the rationales behind the finality

15 requirement.  One reason for requiring some form of final decision is to ensure "that a

16 plaintiff has actually 'been injured by the Government's action' and is not prematurely

17 suing over a hypothetical harm"; another reason is to enable courts to decide whether a

18 "regulation has gone too far" by showing "how far the regulation goes."  <u>Pakdel</u>, 594 U.S.

19 at 479 (quoting <u>Horne v. Dep't of Agric.</u>, 569 U.S. 513, 525 (2013); <u>MacDonald, Sommer</u>

20 <u>& Frates v. Yolo Cnty.</u>, 477 U.S. 340, 348 (1986)).  For these purposes to be achieved, it is

21 necessary that "the government [be] committed to a position."  <u>Id</u>.  Accordingly, <u>Pakdel</u>

22

23 _____

[2] Plaintiffs cite only <u>Palazzolo v. Rhode Island</u>, 533 U.S. 606, 621 (2001), but this case does not
24 help them.  Instead, it supports the basic principle that the ripeness of takings claims "depends
upon the landowner's first having followed reasonable and necessary steps to allow regulatory
25 agencies to exercise their full discretion in considering development plans for the property,
including the opportunity to grant any variances or waivers allowed by law." <u>Id</u>. at 620–21.
26 Plaintiffs also cite <u>Palazzolo</u> for the proposition that "[g]overnment authorities . . . may not burden
property by imposition of repetitive or unfair land-use procedures in order to avoid a final
27 decision." <u>Id</u>. at 621.  But no plausible reading of the complaint suggests that the City's
procedures are designed to "avoid a final decision."  Moreover, it is unclear how the Court could
28 hold that the City was avoiding a final decision when Plaintiffs have not sought a decision in the
first place.

clearly assumes that, for there to be "de facto finality," the government must have at least

taken some sort of "position" or reached some kind of "decision."  See Pakdel, 594 U.S. at

479, 480.  Even under the futility exception to the ripeness doctrine, some effort to seek an

exception is generally required. See Suitum v. Tahoe Regl. Plan. Agency, 520 U.S. 725,

737 (1997); Traweek v. City and Cnty. of San Francisco, 920 F.2d 589, 594 (9th Cir. 1990)

("Generally, before the futility exception applies, the complainant must submit at least one

application for a variance."); see also Patel v. City of S. El Monte, No. 21-55546, 2022

WL 738625, at *2 (9th Cir. Mar. 11, 2022) (unpublished) ("Patel did not satisfy the finality

requirement, nor was he excused by the futility exception.  Under either argument, courts

generally require that a plaintiff seek a variance or exemption.").  Plaintiffs have not

sought an exception from the Rent Control Law or submitted an application to close their

parks.  By itself, the lack of any decision by the City—final, de facto final, provisional, or

otherwise—renders Plaintiffs' claims unripe.

Importantly, Plaintiffs' allegations show that the application of the challenged

regulatory regime to their properties is not a certain thing.  Recall that Plaintiffs' claims are

based on the combined application of two regulatory requirements to their properties.

First, they say, "[b]ecause of the City's Rent Control Law, which has made it economically

infeasible to continue park operations, Little Woods and Youngstown seek to close their

parks." Compl. ¶ 63.  But, second, "the City's pre-closure requirements, applied in

conjunction with the MRL and PZL, operate to bar Little Woods and Youngstown from

closing and to instead compel the parks to continue leasing their land to mobilehome

owners against the parks' will and at continued economic loss."  Id. ¶ 64.

The Court could only speculate about "how far" both of these regulations go as

applied to Plaintiffs' parks.  Pakdel, 594 U.S. at 479.  First, the application of the City's

Rent Control Law has not been conclusively determined: Plaintiffs have not sought an

exception from the maximum rent increase through the process they allege is set out in the

law.  Pakdel affirmed "that a plaintiff's failure to properly pursue administrative

procedures may render a claim unripe if avenues still remain for the government to clarify

or change its decision." Id. at 480 (emphasis in original).  That is the case here.  It cannot be said that the "government has reached a conclusive position" when such avenues remain available to Plaintiffs.  See id.  Plaintiffs argue that pursuing these procedures would present "insurmountable and cost-prohibitive hurdles," at least in part because they believe that the arbitration process prescribed in the City ordinance is "stacked against the park owner."  Compl. ¶ 20(c).  But it is undisputed that the arbitrator who would decide the matter, after hearing evidence from residents, Plaintiffs, and others, would have discretion to raise rents above the allowed as-of-right increase.  As long as that is so, there is not "no question" about what the outcome of the process would be, Pakdel, 594 U.S. at 478, even if there are reasons to think that an outcome unfavorable to plaintiffs is probable.  Cf., e.g., Valley Investments-Redwood LLC v. City of Alameda, No. 22-CV-06509-DMR, 2023 WL 2868838, at *7 (N.D. Cal. Apr. 10, 2023) ("Plaintiff's contention that any petition to increase fees would be 'futile' because of the City's 'baseless hostility' is conclusory and speculative. . . .The Rent Control Ordinance explicitly allows a designee of the City or the Housing Authority to grant landlords an individual rent adjustment.").  The failure to pursue the rent control exemption process is significant not just for Plaintiffs' fourth claim, which is expressly directed at the Rent Control Law, but also for Plaintiffs' other takings clause claims.  Understanding how far Plaintiffs are allowed to raise rents will be necessary for evaluating Plaintiffs' larger theory that it is "economically infeasible to continue park operations" and that the closure regulations "compel the parks to continue leasing their land to mobilehome owners against the parks' will and at continued economic loss."  Compl. ¶ 64.

To be sure, Pakdel rejected what it characterized as the "Ninth Circuit's demand that a plaintiff seek 'an exemption through the prescribed [state] procedures.'"  Id. at 479 (quoting Pakdel v. City and Cnty. of San Francisco, 952 F.3d 1157, 1167 (9th Cir. 2020)).  But the point was that the plaintiff in Pakdel had already received a final decision from the relevant government authority; what the Supreme Court rejected was the idea that the plaintiffs were obliged to continue seeking some further relief from that decision through

administrative channels.  See Pakdel, 594 U.S. at 478–81.  The City has not "reached a conclusive position" regarding the Rent Control Law's application to their properties at all. Id. at 480.  Plaintiffs have not asked it to do so.

There also remains uncertainty about the outcome of any closure application process.  As noted, Plaintiffs do not allege that they have applied for closure with the City or received any other determination related to their ability to close.  Nevertheless, Plaintiffs say that they are unable to get the information from their residents necessary to complete the required relocation impact report, so their application would certainly be rejected.  Second, Plaintiffs say that even if they were able to complete the report, the outcome of their application would be certain: they would get either a denial or its equivalent, the imposition of impossibly high mitigation costs as a condition of closure.

But, despite Plaintiffs' assertions, there are questions about how the regulations at issue would apply to Plaintiffs' property.  Plaintiffs argue, for example, that they have been unable to collect information from their residents necessary to complete a relocation impact report, and thus that they are unable to even complete an application for closure. But whether this would be grounds for automatic denial of their application is not clear from the municipal code.  For one thing, the completeness of the impact report is one factor among a non-exclusive list that the city council is obliged to consider in evaluating a park closure application.  See PMC § 8.34.090.  For another, the PMC requires that a park owner request that the City initiate the process for completion of a relocation impact report and provides that the city will "then contract with a consultant for the preparation of the relocation impact report."  PMC § 8.34.050(C).  That does not seem to be what occurred here.  Instead, Plaintiffs have undertaken to complete the report themselves, and then have pled that doing so is impossible for them.  See Compl. ¶¶ 47–51.

Plaintiffs also argue that the City, even if it were to receive and consider their application, would ultimately be bound to impose the in-place value condition, which would effectively prevent Plaintiffs from closing.  But here, too, there is reason for doubt. As the City points out, the City closure regulations are more "flexible" than the state's

requirements.  They do not make imposition of the in-place value condition mandatory in the way that the California PZL does.  Thus, while the PZL states that park owners "shall" pay "the current in-place market value of the displaced residents' mobilehome" if there is no adequate housing in another mobile home park, Cal. Gov't Code § 65863.7(a)(2)(A)), the City ordinance provides that the City Council "may" condition closure on payment of fair market value of mobile homes, among a non-exhaustive list of other mitigation conditions the Council has discretion to impose.  See PMC § 8.34.100 (emphasis added).  Plaintiffs acknowledge these differences, but they argue that the City is bound to apply the state law regardless.  The PZL is, after all, supposed to be a "minimum standard for local regulation."  Cal. Gov't Code Ann. § 65863.7(k).  On the other hand, the City takes the position that it "retains discretion under state and local to choose whether to impose mitigation measures, and which to choose (and provides that mitigation measures imposed by the City shall not exceed the reasonable cost of relocation)."  Mot. at 25 n.12.  The oddity of this situation is worth noting: Plaintiffs are essentially arguing that the City should impose harsher conditions on their properties than the City believes are required.

The fact that there is dispute about what rules the City would apply if it were faced with an application from Plaintiffs only underscores their ripeness problems.  Under these circumstances, reaching the merits would essentially require the Court to render an opinion of the following form: "if the plaintiffs were to apply to close, and if their application were accepted and evaluated, and if the City were wrong about their discretion under the applicable law, and if someone compelled the city to apply the non-discretionary conditions rather than exercise the discretion provided by the City ordinance, then the City would violate the Takings Clause."[3]  That would just be an advisory opinion. See Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc) ("Our role is neither to issue advisory opinions nor to declare rights in hypothetical cases, but to

---

[3] Perhaps an alternative would be to evaluate the constitutionality of the PZL and the Rent Control Law in the abstract, i.e., whether they could ever be constitutionally applied.  But that would just be a facial challenge—and Plaintiffs say they aren't bringing one, and they would have statute of limitations problems if they were.

1    adjudicate live cases or controversies consistent with the powers granted the judiciary in

2    Article III of the Constitution.").  The ripeness doctrine is designed to avoid such things.[4]

3    See id.

4         **C.    Contracts Clause Claim (Count III)**

5         The Contracts Clause provides that "No State shall . . . pass any . . . Law impairing

6    the Obligation of Contracts."  U.S. Const. art. I, § 10, cl. 1.  The Supreme Court has most

7    recently restated the Contracts Clause inquiry as a "two-step test."  Sveen v. Melin, 584

8    U.S. 811, 819 (2018).  "The threshold issue is whether the state law has 'operated as a

9    substantial impairment of a contractual relationship.'"  Id.  In making that determination,

10   courts look to "the extent to which the law undermines the contractual bargain, interferes

11   with a party's reasonable expectations, and prevents the party from safeguarding or

12   reinstating his rights."  Id.  If the law is a substantial impairment, then "the inquiry turns to

13   the means and ends of the legislation."  Id.  At this portion of the inquiry, the court asks

14   "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance "a

15   significant and legitimate public purpose."  Id. (quoting Energy Reserves Group, Inc. v.

16   Kansas Power and Light Co., 459 U.S. 400, 411–412 (1983)).  Unless the government is a

17   contracting party, "courts properly defer to legislative judgment as to the necessity and

18   reasonableness of a particular measure."  Apt. Ass'n of Los Angeles Cnty., Inc. v. City of

19   Los Angeles, 10 F.4th 905, 913 (9th Cir. 2021) (quoting Energy Reserves Group, 459 U.S.

20   at 413).

21        Plaintiffs' Contracts Clause claim concerns the PZL's "in-place value condition."

22   After the enactment of AB 2782, if residents displaced by a mobile home park closure

23   "cannot obtain adequate housing in another mobilehome park," then the park owner "shall

24   pay to the displaced resident the in-place market value of the displaced resident's

25   _____

26   [4] In the takings context, ripeness is "prudential rather than jurisdictional."  Guggenheim v.
     City of Goleta, 638 F.3d 1111, 1118 (9th Cir. 2010).  Here, though, there are no persuasive
27   reasons to waive the ripeness issues and move to the merits of the takings claims.
     Plaintiffs have made no effort to seek a decision from the city regarding a rent increase or
28   their closure application.  Moreover, for the reasons described in this paragraph, the risk of
     rendering an advisory opinion is real.

United States District Court
Northern District of California

1    mobilehome." Cal. Gov't Code § 65863.7(a)(2)(A). The Contracts Clause claim is based

2    on the theory that the "in-place value condition" "substantially impairs the leases and

3    rental agreements" between Plaintiffs and their residents because, by effectively

4    preventing Plaintiffs from closing operations, it turns the residents' temporary leaseholds

5    into "a permanent interest or right in the leased or rented spaces, in substantial

6    contravention of the parties' agreements." Compl. ¶ 78. It therefore "interferes with Little

7    Woods' and Youngstown's reasonable expectations that they were conveying a leasehold,

8    not a fee simple." Id.

9                    **1.      Standing to Bring the Contracts Clause Claim**

10            As a threshold matter, the City argues that Plaintiffs have no standing to pursue this

11   claim. "To establish standing, a plaintiff must show (1) an 'injury in fact,' (2) a 'causal

12   connection between his injury and the conduct complained of,' and (3) that his injury will

13   'likely . . . be redressed by a favorable decision.'" Iten v. Los Angeles, 81 F.4th 979, 984

14   (9th Cir. 2023) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560, 561 (1992)).

15           The City argues that Plaintiffs cannot meet any of these requirements. They say

16   that Plaintiffs have suffered no injury-in-fact, since they have not actually applied to close

17   their parks and, accordingly, no mitigation costs have been assessed. They argue that any

18   injury they have suffered is not traceable to the City, as opposed to the state. And they

19   argue that the Court cannot redress any harm Plaintiffs have suffered, since the challenged

20   law is state legislation, not a city ordinance.

21           But Plaintiffs have pled standing to seek injunctive and declaratory relief under the

22   Contracts Clause. With respect to their injury-in-fact, Plaintiffs have pled, in essence, that

23   AB 2782 "imposed additional rights, remedies, conditions, or procedures that impair the

24   obligations to which [they and their] Tenant[s] had contracted." Iten v. Los Angeles, 81

25   F.4th 979, 988 (9th Cir. 2023). It is true that, as discussed above, the City's park closure

26   ordinance differs from the state statute with respect to the in-place value condition. Here,

27   though, it matters that Plaintiffs seek prospective relief. Plaintiffs are essentially mounting

28   a pre-enforcement challenge under the Contracts Clause. That being so, Plaintiffs must

allege (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) that "[t]he intended future conduct [is]  arguably proscribed by the challenged statute," and (3) that "the threat of future enforcement [is] substantial." Peace Ranch, LLC v. Bonta, 93 F.4th 482, 487 (9th Cir. 2024) (cleaned up) (citing Susan B. Anthony List v. Driehaus, 573 U.S. 149, 161, 162, 164 (2014)).  They have done so. Plaintiffs have alleged an intention to close their parks, which would necessarily involve terminating their leases—contractual relationships that are arguably affected with a constitutional interest for purposes of this Contracts Clause claim.  See id. at 488.  If they seek to close their parks, Plaintiffs could be required by the City to pay residents the in-place value of their mobile homes, since even under the City's view of the law, the City retains the discretion to impose that condition on closure.  At any rate, the "relevant question" with respect to the second element of the Driehaus test is whether Plaintiffs plausibly allege that they refrained from closing because they might be subject to the in-place value condition.  See id. at 489 ("Thus, the relevant question is whether Peace Ranch plausibly alleged that it refrained from raising rents because of the Attorney General's interpretation of AB 978.").  The complaint permits that inference.  Finally, whether there is a "substantial threat" of enforcement "often rises or falls with the enforcing authority's willingness to disavow enforcement."  Id. at 489–90.  Here, importantly, the City has taken the position that it has discretion not to impose the in-place value condition, but it has carefully avoided saying that it will not do so.  Accordingly, the third factor is satisfied, and Plaintiffs have alleged an injury-in-fact at this stage.[5]

     As for traceability, it is at least plausible that if anyone enforces the in-place value condition against the Plaintiffs, it will be the City of Petaluma.  As for redressability, the

---

[5] For the same reasons, their Contracts Clause meets the requirements of the constitutional component of the ripeness inquiry—that is, the claim is sufficiently ripe for jurisdictional purposes.  See Thomas v. Anchorage Equal Rts. Comm'n, 220 F.3d 1134, 1138–39 (9th Cir. 2000) (en banc); see also California Pro-Life Council, Inc. v. Getman, 328 F.3d 1088, 1094 n.2 (9th Cir. 2003) ("[T]he constitutional component of ripeness is synonymous with the injury-in-fact prong of the standing inquiry.").

United States District Court
Northern District of California

prospective relief Plaintiffs seek—which includes an injunction against the City of Petaluma precluding imposition of the in-place value condition—would redress Plaintiffs' injuries under the Contracts Clause.  Accordingly, Plaintiffs have pled standing to pursue this claim.

### 2.    Merits of the Contracts Clause Claim

As noted, the threshold question for a Contracts Clause claim "is whether the state law has 'operated as a substantial impairment of a contractual relationship.'"  Sveen v. Melin, 584 U.S. 811, 819 (2018).  In making that determination, courts look to "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights."  Id.  "[W]hen considering substantial impairment, [courts] focus on the importance of the term which is impaired, not the dollar amount."  S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003).  The Contracts Clause is "narrowly construe[d]" in order "to ensure that local governments can effectively exercise their police powers."  Id.

The City argues that Plaintiffs cannot plead, as a matter of law, that their reasonable expectations would be "substantially" undermined by the imposition of the in-place value condition.  The City's point is not that the contractual term allegedly affected by the in-place value condition—that is, the right to evict a tenant or not a tenant's lease—is unimportant.  Rather, its point is that AB 2782 can hardly be said to have substantially impaired these contractual terms, given the longstanding and onerous regulation of mobile home parks' ability to close operations or evict tenants in California.  The Court agrees.

Where a given field of contractual activity is already subject to "extensive regulation," courts routinely reject Contracts Clause claims on the grounds that a challenged law is necessarily "foreseeable as the type of law that would alter contract obligations."  Energy Reserves Group, Inc. v. Kansas Power and Light Co., 459 U.S. 400, 411–12, 416 (1983); see also Sanitation and Recycling Indus., Inc. v. City of New York, 107 F.3d 985, 993 (2d Cir. 1997) ("When an industry is heavily regulated, regulation of contracts may be foreseeable; thus, when a party purchases a company in an industry that

is 'already regulated in the particular to which he now objects,' that party normally cannot prevail on a Contract Clause challenge.") (quoting <u>Veix v. Sixth Ward Building & Loan Ass'n</u>, 310 U.S. 32, 38 (1940)).  This rationale has often been applied in the landlord-tenant context.  <u>See, e.g.</u>, <u>Ballinger v. City of Oakland</u>, 398 F. Supp. 3d 560, 577 (N.D. Cal. 2019), <u>aff'd</u>, 24 F.4th 1287 (9th Cir. 2022) (finding that Oakland relocation fee ordinance that required owners to pay their tenants in order to decline to renew their leases did not substantially impair contractual relationship because "given the 'existence of extensive regulation' of the landlord-tenant relationship, the Ballingers could not reasonably have expected the regulatory landscape to remain unchanged indefinitely"); <u>Valley Investments-Redwood LLC v. City of Alameda</u>, No. 22-CV-06509-DMR, 2023 WL 2868838 (N.D. Cal. Apr. 10, 2023) (holding that onerous regulation of houseboats that restricted berth owners' ability to evict tenants or declining to renew leases did not substantially impair contractual relationship because governments have long "regulated landlord-tenant relationships through rent control laws, among other means," and "floating homes have been subject to regulation by the FHRL"); <u>see also, e.g.</u>, <u>Chicago Bd. of Realtors, Inc. v. City of Chicago</u>, 819 F.2d 732, 736 (7th Cir. 1987) ("We are certain that the landlord-tenant relationship is, if nothing else, heavily regulated. . . . The extent of this prior regulation suggests that the Ordinance in fact might not substantially impair any contract obligations.").

Here, too, the longstanding, extensive regulation of California's mobile home parks—which includes regulation "in the particular to which [Plaintiffs] now object[ ]"—precludes their Contract Clause claim.  <u>Veix</u>, 310 U.S. at 38.  Plaintiffs' claim is premised on the notion that AB 2782 impaired their expectations about the type of property interest they were conveying to their tenants.  <u>See id.</u> ¶¶78–79.  But, understood in context, AB 2782 worked only a relatively minor change to the law that applied to Plaintiffs' leases. The prior version of Cal. Gov't Code § 65863.7, while lacking the <u>mandatory</u> imposition of a specific type of relocation compensation, nevertheless gave legislative bodies broad discretion to require

> as a condition of the change [in use of the mobile home park],
> the [park owner] to take steps to mitigate any adverse impact of
> the conversion, closure, or cessation of use on the ability of
> displaced mobilehome park residents to find adequate housing
> in a mobilehome park.  The steps required to be taken to
> mitigate shall not exceed the reasonable costs of relocation.

Cal. Gov't Code. § 65863.7 (2009) (West).  This provision gave local governments broad

discretion to impose mitigation requirements that could account for "the ability of

displaced mobilehome park residents to find adequate housing in a mobilehome park."  If

there were no other available adequate housing in a given area, the old law would very

likely have authorized the imposition of the same level of "cost-prohibitive" mitigation

measures contemplated in AB 2782.  Indeed, as Plaintiffs themselves argue, the City of

Petaluma's ordinance—which existed in the same form before AB 2782 was passed—

gives the City discretion to impose the equivalent of the in-place value condition.  The

ordinance requires that displaced homeowners be paid the "fair market value for their

mobilehome," and it defines "fair market value" essentially to mean "in-place value."

PMC §§ 8.34.100, 8.34.050.  In other words, even before the passage of AB 2782, there

existed a substantial possibility that payment of the "in-place value" might be imposed as a

condition of closure of a mobile home park in Petaluma.  It just is not plausible that

Plaintiffs could have expected no further regulation along those lines.  Nor could the

subsequent changes to the PZL have "substantially impaired" Plaintiffs' contractual rights,

which were already potentially subject to the in-place value condition.

        More broadly, California's mobile home park regulation scheme has long restricted

park owners' ability to remove their tenants.  Indeed, Plaintiffs' description of their

Contracts Clause injury echoes claims that California mobile home park owners have been

bringing for about four decades.  To take only a couple of examples: in Yee v. City of

Escondido—a case that eventually reached the Supreme Court in 1992—California mobile

home park owners argued that the combined effect of mobile home park rent control and

occupancy regulations was to "deprive[ ] the plaintiffs of all use and occupancy of [their]

real property and [to] grant[ ] to the tenants of mobilehomes presently in The Park, as well

as the successors in interest of such tenants, the right to physically permanently occupy and use the real property of Plaintiff."  503 U.S. 519, 525 (1992).  And in <u>Levald, Inc. v. City of Palm Desert</u>, 998 F.2d 680 (9th Cir. 1993), park owners brought a constitutional challenge to California's regulation of mobile home parks, arguing that "the combined effect of the residency laws and the [rent control] ordinance . . . is that a property interest is transferred from the landlord to its tenants: the right perpetually to occupy park spaces at below-market rents."  <u>Id.</u> at 684.  Compare these descriptions of the park owners' predicaments with Plaintiffs' allegations.  Plaintiffs say that the in-place value requirement "effectively and retroactively creates a permanent interest or right in the leased or rented spaces, in substantial contravention of the parties' agreements," thus interfering "with Little Woods' and Youngstown's reasonable expectations that they were conveying a leasehold, not a fee simple."  Compl. ¶ 78.  In other words, Plaintiffs argue that AB 2782 has unexpectedly impaired their contracts by granting to their tenants—in the Supreme Court's phrase—"the right to physically permanently occupy and use the real property of Plaintiff."  <u>Yee</u>, 503 U.S. at 525.  <u>Yee</u> and <u>Levald</u> are, of course, not Contracts Clause cases.  But they concern the same field of economic activity and the same basic set of regulations.  In fact, it is safe to say that the very purpose of California's regulatory scheme is to grant protections against the termination of mobile home park tenancies—or, in other words, to make them something other than ordinary common-law leaseholds.  California's Mobilehome Residency Law, enacted in 1978, was based on legislative findings that

> because of the high cost of moving mobilehomes, the potential for damage resulting therefrom, the requirements relating to the installation of mobilehomes, and the cost of landscaping or lot preparation, <u>it is necessary that the owners of mobilehomes occupied within mobilehome parks be provided with the unique protection from actual or constructive eviction</u> afforded by the provisions of this chapter.

Cal. Civ. Code § 798.55(a) (emphasis added); <u>see also</u> <u>Yee</u>, 503 U.S. at 523–25 (discussing the Mobilehome Residency Law and local rent control ordinances adopted in its wake).  Against this backdrop, it is hard to see how Plaintiffs can claim to have

United States District Court
Northern District of California

1    reasonably expected that these regulations would not continue, or that further obstacles to

2    the termination of mobile home tenancies might not be imposed.

3        To be sure, the Complaint alleges the contrary: that "[n]either Little Woods nor

4    Youngstown could ever have anticipated that their contracts would be so substantially and

5    retroactively impaired" by AB 2782.  Compl. ¶ 79.  But that allegation is conclusory—it

6    simply recites one of the elements of a Contracts Clause claim.  Simply put, mobile home

7    parks in California have long been onerously regulated, and park owners in Petaluma were

8    already exposed to a possible assessment of the in-place value of their residents' mobile

9    homes as a condition of closure.  AB 2782's in-place value condition worked little, if any,

10   impairment to Plaintiffs' reasonable contractual expectations.[6]  In analyzing park owners'

11   reasonable investment-backed expectations in the regulatory takings context, the Ninth

12   Circuit once observed that, "[j]ust as '[t]hose who do business in [a] regulated field cannot

13   object if the legislative scheme is buttressed by subsequent amendments to achieve the

14   legislative end,' those who buy into a regulated field such as the mobile home park

15   industry cannot object when regulation is later imposed."  Rancho de Calistoga v. City of

16   Calistoga, 800 F.3d 1083, 1091 (9th Cir. 2015) (quoting Concrete Pipe and Prods. of Cal.,

17   Inc. v. Constr. Laborers Pension Tr., 508 U.S. 602, 645 (1993)) (some alterations in

18   original).  The same reasoning applies in this context: Plaintiffs cannot show that AB 2782

19   impaired their reasonable expectations, so their Contract Clause claim fails.  See Energy

20   Reserves Group, 459 U.S. at 411–12; Veix, 310 U.S. at 38.

21   **IV.    CONCLUSION**

22       For the foregoing reasons, the motion to dismiss is granted.  Plaintiffs' takings

23   claims are dismissed without prejudice, and the Contracts Clause claim is dismissed with

24   prejudice.  Because the basis for Plaintiffs' ripeness and standing problems are either

25

26   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [6] It is worth noting that both Plaintiffs acquired their parks in Sonoma County after the
     core elements of California's mobile home regulation regime were in place: Little Woods
27   acquired its park in June 1998, and Youngstown acquired its park in November 2020.  See
     Exs. 6–10, Def.'s Request for Judicial Notice (dkt. 17).  California's Mobilehome
28   Residency Law was enacted in 1978.  Indeed, Youngstown acquired its park after AB 2782
     itself had been passed by the California legislature in August 2020.

alleged in the complaint itself or otherwise impossible to fix with further factual allegations,[7] any amendment would be futile.  See Salameh v. Tarsadia Hotel, 726 F.3d 1124, 1133 (9th Cir. 2013) ("Although a district court should grant the plaintiff leave to amend if the complaint can possibly be cured by additional factual allegations, dismissal without leave to amend is proper if it is clear that the complaint could not be saved by amendment.") (cleaned up); Reddy v. Litton Industries, Inc., 912 F.2d 291, 297 (9th Cir. 1990) (an "amended complaint may only allege other facts consistent with the challenged pleading") (quotation marks omitted).  Accordingly, the dismissal is without leave to amend.

**IT IS SO ORDERED.**

Dated: June 4, 2024

CHARLES R. BREYER
United States District Judge

---

[7] For example, Plaintiffs' failure to make any closure application to the City, Plaintiffs' failure to pursue an exception from the Rent Control Law, the general lack of any kind of de facto final decision from the City, and—with respect to the Contract Clause claim—the extensive and longstanding regulation of mobile home park owners' ability to evict or remove tenants.